ATTACHMENT A

## FACTUAL STATEMENT

### Introduction

1.      This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated October 19, 2015, between the United States Attorney's Office for the District of Columbia ("USAO-DC") and Crédit Agricole Corporate and Investment Bank ("CACIB"), a French bank that previously operated under the name, "Calyon," and between the New York County District Attorney's Office ("DANY") and CACIB.  CACIB admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  Should USAO-DC or DANY pursue the prosecution that is deferred by this Agreement, CACIB agrees that it will neither contest the admissibility of, nor contradict, this Factual Statement in any proceeding.

2.      Pursuant to U.S. law, financial institutions, including CACIB, are prohibited from participating in certain financial transactions involving persons, entities, and countries subject to U.S. economic sanctions.  The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") promulgates economic sanctions, including regulations for sanctions related to specific countries, as well as sanctions related to Specially Designated Nationals ("SDNs").[1]

3.      From at least in or around August 2003 up through and including September 2008, CACIB, through its subsidiary in Switzerland, Crédit Agricole (Suisse) SA ("CAS"), and its predecessor entities, Crédit Agricole Indosuez (Suisse) SA ("CAIS")

---

[1] SDNs are individuals and companies specifically designated as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under programs that are not country-specific.

1

and Crédit Lyonnais (Suisse) SA ("CLS"), violated U.S. and New York State laws by sending prohibited payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions.   In an effort to evade detection by U.S. bank personnel as well as U.S. authorities, CAS and its predecessor entities knowingly, intentionally, and willfully concealed the sanctioned entities' involvement with these transactions.   Consequently, U.S. and New York financial institutions processed transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to regulations promulgated by OFAC relating to transactions involving sanctioned countries and parties.

4.      The conduct of CAS and its predecessor entities included, among other things, (i) sending payments on behalf of sanctioned customers without reference to the payments' origin; (ii) eliminating payment data that would have revealed the involvement of sanctioned countries with the specific intent to evade U.S. sanctions; and (iii) using alternative payment methods to mask the involvement of sanctioned entities, including the use of two payment messages, for payments involving sanctioned financial institutions that were sent to the United States.

5.      By providing banking services on behalf of sanctioned entities, CAS and its predecessor entities: (i) prevented detection by U.S. regulatory and law enforcement authorities of financial transactions that violated U.S. sanctions; (ii) prevented U.S. financial institutions from filing required reports with the U.S. government; (iii) caused false information to be recorded in the records of U.S. financial institutions; (iv) caused U.S. financial institutions not to make records that they otherwise would have been required by U.S. law to make; and (v) caused false entries to be made in the business

records of financial institutions located in New York, New York.   These payment methods deceived U.S. financial institutions and created the false appearance that the transactions had no connection to sanctioned entities.

### CACIB's Business Organization and Assets

6.      Crédit Agricole S.A. ("CASA") is currently the largest retail banking group in France and one of the largest retail banking groups in Europe.  As of December 31, 2014, CASA had €1.59 trillion of consolidated assets.  CASA is headquartered in Montrouge, France.  CASA has a number of subsidiaries and affiliates, including, among others, CACIB and Crédit Lyonnais ("CL").  CL was ultimately rebranded "LCL" and continues to operate an extensive retail banking network in France.  The CASA group has a presence in over 60 countries, with 11,300 branches worldwide.  CASA is listed on the Paris Stock Exchange (Euronext Paris).  CASA acquired CL in and around 2003.

7.      CACIB is the result of a 2004 transfer of the corporate and investment banking operations of CL to another CASA subsidiary, Crédit Agricole Indosuez ("CAI").  CACIB initially operated under the name "Calyon."  In 2010, it began operating under its current name, CACIB.  Hereinafter, regardless of whether the entity was operating under the name "Calyon" or "CACIB," the entity is identified as CACIB.

8.      CLS was a subsidiary of CL that CL operated in Switzerland prior to CASA's acquisition of CL.

9.      CAIS was a subsidiary of CAI that CAI operated in Switzerland prior to CASA's acquisition of CL.

10.      CAS was formed in March 2005.  CACIB combined the operations of CLS and CAIS to form CAS.

11.     Since at least 1997, CAI, and subsequently CACIB, had a license issued by the state of New York to operate as a foreign bank branch in New York, New York. Prior to the 2004 merger, CL had a license issued by the state of New York to operate as a foreign bank branch in New York, New York.

## Applicable Law

### The International Emergency Economic Powers Act

12.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

13.     It is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

### *The Sudanese Sanctions*

14.     On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan.  Effective July 1, 1998, OFAC issued the Sudanese Sanctions Regulations ("SSR"), 31 C.F.R. Part 538, to implement Executive Order No. 13067.  On October 13, 2006, President George W. Bush issued Executive Order No. 13412 (collectively with Executive Order No. 13067, the "Sudanese Executive Orders"), which continued the comprehensive blocking of the Government of Sudan imposed by Executive Order No. 13067, but exempted the then-regional Government of South Sudan from the definition of the Government of Sudan.  The

4

Sudanese Executive Orders prohibited virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (i) the importation into the United States of goods or services from Sudan; (ii) the exportation or re-exportation of any goods, technology, or services from the United States or by a U.S. person to Sudan; and (iii) trade- and service-related transactions with Sudan by U.S. persons, including financing, facilitating, or guaranteeing such transactions.  The Sudanese Executive Orders further prohibited "[a]ny transaction by any U.S. person or within the U.S. that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [the SSR]."  With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese sanctions generally prohibited the export of services to Sudan from the United States.

*The Burmese Sanctions*

15.    In May 1997, President Clinton, pursuant to IEEPA, issued Executive Order No. 13047, finding that "the actions and policies of the Government of Burma constitute an unusual and extraordinary threat to the national security and foreign policy of the United States" and "declare[d] a national emergency to deal with that threat."  The Executive Order prohibited new investment in Burma by U.S. persons.  The Executive Order also prohibited "any approval or other facilitation by a United States person, wherever located, of a transaction by a foreign person where the transaction would constitute new investment in Burma" and "any transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions" set forth in the OFAC regulations.

16.     In July 2003, President Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta, and issued Executive Order No. 13310, which blocked all property and interest in property of other individuals and entities meeting the criteria set forth in that order.   President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked.   Executive Order No. 13310 also prohibited the importation into the U.S. of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the U.S., or by U.S. persons, wherever located.   The "exportation or re-exportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the U.S.

*The Iranian Sanctions*

17.     On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

18.     President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or by U.S. persons, wherever located.   This included persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly

or indirectly, to Iran or the Government of Iran.  On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders").  The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"),[2] 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

19.    With the exception of certain exempt transactions, the ITRs prohibited, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts.  One such exception would be transactions for which a validated export license had been obtained from OFAC, which is located in the District of Columbia.  The ITRs also prohibit transactions that evade or avoid, have the purpose of evading or avoiding, or attempt to evade or avoid the restrictions imposed under the ITRs.  The ITRs were in effect at all times relevant to the conduct described below.

20.    While the ITRs promulgated for Iran prohibited USD transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial institution.  This exemption is commonly known as the "U-turn exemption."

21.    The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank.  In relevant part, the ITRs provided that U.S. banks

---

[2]    Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITRs as the Iranian Transactions and Sanctions Regulations.

were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank . . . to an account held by a domestic bank . . . for a [second] foreign bank which is not an Iranian entity." 31 C.F.R. §560.516(a)(1). That is, a USD transaction to or for the benefit of Iran could be routed through the United States as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S. offshore bank. These U-turn transactions were only permissible where no U.S. person or entity had direct contact with the Iranian bank or customer and were otherwise permissible (e.g., the transactions were not on behalf of an SDN).

22.     Effective November 10, 2008, OFAC revoked the U-turn exemption for Iranian transactions. As of that date, U.S. depository institutions were no longer authorized to process Iranian U-turn payments.

23.     At no time did CACIB or its co-conspirators apply for, receive, or possess a license or authorization from OFAC for any of the unlawful transactions discussed below.

<u>The Trading with the Enemy Act & Cuban Asset Control Regulations</u>

24.     Beginning with Executive Orders issued in 1960 and 1962, which found that the actions of the Government of Cuba threatened the U.S. national and hemispheric security, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations. Pursuant to the Trading with the Enemy Act ("TWEA"), 12 U.S.C. Section 95a et seq., OFAC has promulgated a series of rules

and regulations that prohibit virtually all financial and commercial dealings with Cuba, Cuban businesses, and Cuban assets.

25.     Unless authorized by OFAC, the Cuban Assets Control Regulations ("CACRs") prohibit persons subject to the jurisdiction of the United States from engaging in financial transactions involving or benefiting Cuba or Cuban nationals, including all "transfers of credit and all payments" and "transactions in foreign exchange."  31 C.F.R. § 515.201(a).  Furthermore, unless authorized by OFAC, persons subject to the jurisdiction of the United States are prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States."  31 C.F.R. § 515.201(b). The CACRs also prohibit any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations.   31 C.F.R. § 515.201(c).

## USAO-DC Charge

26.     USAO-DC has alleged, and CACIB accepts, that its conduct, as described herein, violated Title 18, United States Code, Section 371, because CACIB conspired to violate IEEPA, specifically Title 50, United States Code, Section 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the regulations prohibiting the export of services from the United States to Iran, Sudan, and Burma; and because CACIB conspired to violate

TWEA, specifically Title 50, United States Code appendix, Section 16, which makes it a crime to willfully violate any of the regulations prohibiting the performance of certain transactions with Cuba.

### DANY Charge

27.     DANY has alleged, and CACIB accepts, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 (Falsifying Business Records in the Second Degree) and 175.10 (Falsifying Business Records in the First Degree), which make it a crime to, "with intent to defraud, . . . [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined as any company or corporation)] . . . or [p]revent[] the making of a true entry or cause[] the omission thereof in the business records of an enterprise."  Pursuant to New York State Penal Law section 175.10, it is a felony to Falsify Business Records, pursuant to New York State Penal Law section 175.05, when the "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

### International Customer Payments at CACIB

28.     CACIB is a member of the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") and historically has used the SWIFT system to transmit international payment messages to and from other financial institutions around the world, including its New York branch.  There are a variety of different SWIFT message formats, depending on the type of payment or transfer to be executed.  For example, when a bank customer sends an international wire payment, the de facto standard to execute such a payment is an MT 103 SWIFT message, and when a financial institution sends a bank-to-bank credit transfer the de facto standard is an MT 202 SWIFT message.  The different

message types contain different fields of information to be completed by the sending party. During the relevant period, some of these fields were mandatory—that is, they had to be completed for a payment to be processed—and others were optional.

29.     In general, U.S. dollar denominated transactions between two individuals or entities who reside outside the United States and who maintain accounts at different non-U.S. banks must transit through the United States through the use of SWIFT messages. This process is typically referred to as "clearing" through U.S. correspondent banks.

30.     During the relevant time period, CACIB typically executed and processed international U.S. dollar denominated wire payments on behalf of clients in two ways. The first method, known as a "serial payment," was to send a single message, commonly referred to as an MT 103, to each financial institution in the transmission chain, identifying the originator and beneficiary of the U.S. dollar denominated payment. The second method, known as a "cover payment" involved sending two SWIFT messages in connection with a single payment. In the cover payment method, one message—typically an MT 103—identifying the originating customer and beneficiary of the payment, was sent directly from the customer's bank (i.e., Foreign Bank A) to the ultimate beneficiary's bank (i.e., Foreign Bank B) while a second message—typically an MT 202—identifying only the originating bank (but not the customer or the beneficiary) accompanied the funds as they transferred through the United States. During the relevant time period, cover payment messages typically did not require the sending bank to identify the party originating a payment or its ultimate beneficiary, whereas serial payment messages did.

As a result, the U.S.-based bank did not receive information needed to stop transactions involving sanctioned entities.

## CACIB's System for Sanctioned Entities

31.   Financial institutions in the United States that process U.S. dollar transactions from overseas, including CACIB's branch in New York ("CACIB NY"), are expected to screen financial transactions, including international wire payments effected through the use of SWIFT messages, to ensure such transactions do not violate U.S. sanctions.   Because of the vast volume of wire payments processed by financial institutions in the United States, most institutions employ sophisticated computer software, commonly referred to as filters, to automatically screen all wire payment messages against a list of sanctioned entities.   When the filters detect a possible match to a sanctioned entity, the payment is stopped and held for further manual review.   When a financial institution detects a transaction that violates sanctions, the institution must "reject" the payment—that is, refuse to process or execute the payment and notify OFAC of the attempted transaction.   If a party to the payment is an SDN, then the payment must be frozen or "blocked" and the bank must notify OFAC.   The sending bank must then demonstrate to OFAC that the payment does not violate sanctions before the funds can be released and the payment processed.

32.   During the relevant time period, CACIB NY utilized an automated OFAC filter that screened all incoming MT 103 and MT 202 payment messages, including all U.S. dollar denominated payment messages sent by CAS and other CACIB branches, using search terms to identify both SDNs and companies owned or controlled by SDNs, or persons located in targeted countries. CLS, CAIS, and CAS, for the duration of the

relevant period, failed to conduct comprehensive filtering akin to the type of filtering conducted by CACIB NY.   After September 11, 2001, in accordance with Swiss regulations, CLS and CAIS added terrorists designated by OFAC—a subset of the SDN List—to their filters.   However, CAS did not actually filter against the complete SDN List until after September 2005.   And it was not until 2008 that CAS began filtering transactions to identify, in a comprehensive fashion, entities involved in transactions that were owned by, controlled by, or located in targeted countries.

## <u>CACIB'S Procedures And Policies Regarding Sanctioned Entities</u>

33.   During the review period, CACIB engaged in billions of dollars of lawful U-turn transactions involving Iran.   While these transactions were permissible under OFAC regulations in effect at that time, it was CACIB policy to not disclose the Iranian connection of such transactions to any U.S. parties.   In September 2005, CACIB London drafted a memorandum entitled *Special Treatment of Iranian Related Payments/Operational Risk* that directed that "no mention of Iran" should be "made on [the MT 202 cover payment]" to the U.S. correspondent banks.   The memo noted the knowledge of "the various departments involved in this process i.e. front, middle and the back-office … of this special treatment as procedures have been implemented to cover this aspect of operational risk."   A separate cover memo to the memo stated that this matter had been vetted "through Compliance and Legal to ensure that all aspects are covered."

34.   In particular, the memo stated that the bank had been "routing USD payments" in a manner that "prevent[ed] funds being seized by the U.S. authorities."   Not surprisingly, personnel within the CACIB network viewed this policy as CACIB

memorializing a procedure for circumventing U.S. sanctions.  For example, in a February 2006 email to a senior compliance officer at CAS, a senior manager within the Monitoring and Investigations Unit ("MOIN") noted "[a]lthough a note has been drawn up by the Group in particular for transactions in USD with Iran as the destination (commercial transactions/oil), the question finally arises of the implementation of *a payments system allowing the US embargo rules to be got around*."  (Emphasis added.)

35.     Furthermore, on March 21, 2007, a Head Office Financial Security employee wrote in an email to another employee, "…on the express condition that the goods are never of Iranian origin or manufacture-this does not fall within the scope of the note.  However, it is evident that in the event of flows and therefore of SWIFTs, references to IRAN in the free fields must be avoided, so as not to have to provide lengthy justification to the Yankee authorities."  On March 22, 2007, the same employee approved an otherwise permissible U-turn transaction regarding goods of Iranian origin owned by a Turkish company if there was "No reference to the country of origin in the SWIFT 10X or 20X messages."

36.     Similarly, in October 2005, an employee at CACIB Dubai—in response to press reports of ABN Amro's U.S. sanctions violations—referenced the use of cover payments for Iranian payments, specifically noting that the MT 202 message was to be sent "***without mentioning the name of the Iranian Bank, or any related reference to the concerned transaction***," (emphasis in original), and questioned whether CACIB's practices were lawful.  This email was ultimately forwarded to compliance personnel at CACIB NY, who promptly raised the issue with CACIB's compliance department in

Paris. In the course of raising concerns, a compliance officer at CACIB NY explained that the email raised concerns that "stripping" was occurring within the Bank's network.

37. On January 31, 2006, another CACIB NY compliance officer questioned the lack of transparency with cover payments, asking a senior manager responsible for compliance at CACIB Paris whether CACIB policy prohibited bank personnel from noting in MT 202s whether the bank-to-bank payment was related to an underlying customer payment (*i.e.*, an MT 103). The senior manager from CACIB Paris responded, stating that Paris reviewed and approved Iranian-related USD payments and that bank personnel were not precluded from noting that an MT 202 was related to an MT 103. But the senior manager failed to disclose that, for Iranian payments, CACIB Paris had a policy that precluded CACIB from mentioning Iran in messages sent through the United States related to U-turn payments. Accordingly, while CACIB NY Compliance personnel had the broadest knowledge of U.S. sanctions of any personnel within the CASA network, CACIB's, CLS's, CAIS's, and CAS's policies, procedures and/or practices for processing international payments involving sanctioned countries or entities removed CACIB NY compliance personnel, their filter, and their expertise from the review process.

### *CLS*

38. From as early as 1997, certain CLS personnel were aware of the U.S. sanctions against Sudan and the fact that these sanctions applied to payments CLS sent through the United States. On November 11, 1997, a CLS senior commercial bank manager disseminated a memo reflecting the fact that Sudan had been added to the list of countries under U.S. embargo. Specifically, the memo stated that "it is strictly prohibited

to pass by a U.S. correspondent, or by C.L. New York." Again in 1998, the same employee wrote and disseminated a policy to CLS's Client Administration department directing that no transactions involving Iran, Sudan, or other sanctioned countries, could pass by a U.S. correspondent or CL New York. Specifically, the policy stated "[a]ll funds in USD in transit with U.S. banks, referring to governmental and non-governmental entities, as well as individuals residing in the above-mentioned countries are legally blocked."

39.     CL New York compliance personnel also provided training to CLS compliance personnel on U.S. sanctions that explained that "OFAC imposes controls on transactions and can freeze foreign assets under U.S. jurisdiction."

40.     Despite these directives and the training they received, CLS personnel allowed 11 Sudanese banks to maintain USD accounts with CLS, including six SDN banks, one of which was not on the SDN List, but was considered an SDN by operation of law, and processed payments from these accounts through the United States. Many of these payments were bank-to-bank transfers, which could be completed through a single MT 202 message. Because these types of transactions did not require the use of an MT 103, CLS could not obfuscate the sanctioned entities' involvement using the cover payment method. Accordingly, CLS created two MT 202s—one MT 202 message reflecting the involvement of a sanctioned entity that was sent directly to the payee's foreign bank, and a different MT 202 message that did not divulge such information that was sent to the U.S. correspondent banks.

41.     An example of how this practice worked is reflected in a payment that occurred on or about September 9, 2004. CLS sent $1 million on behalf of one of its

sanctioned Sudanese clients for the benefit of a sanctioned Sudanese bank.  In the MT 202 CLS sent to the Lebanese bank, at which the Sudanese bank held an account, both the Sudanese originator and the Sudanese beneficiary were listed.  However, CLS failed to identify the ultimate beneficiary in the MT 202 message it sent to the U.S. correspondent bank and deceptively listed the Lebanese bank as the beneficiary of the transaction rather than the ultimate Sudanese beneficiary.

42.     Two facts demonstrate that CLS's use of two MT 202 messages was a method for circumventing sanctions.  First, additional fees were incurred by employing this process.  The sanctioned entity sending such a payment would unnecessarily incur a fee for generating two MT 202s, when all of the lawful objectives of such a payment could be accomplished through a single payment message.  Second, as a general rule, CLS processed payments using two MT 202 messages for Sudanese banks, while CLS processed bank-to-bank payments for non-sanctioned banks using a single MT 202 message.  Specifically, from August 1, 2003 to March 1, 2005, CLS processed bank-to-bank payments using two MT 202 messages approximately 83% of the time for sanctioned Sudanese banks but only 11% of the time for non-sanctioned banks.

43.     Furthermore, CLS policies made clear that its personnel were using cover payments in an effort to circumvent U.S. sanctions.  For example, in an email dated March 23, 2004, a CLS senior back office manager disseminated a policy that required the ordering party be reflected on MT 202 messages, except for when a risk of embargo was possible.

44.     In addition, throughout the relevant period, there were repeated instances of Sudanese banks, including one that was an SDN, requesting that CLS not mention its name in MT 202 messages sent to U.S. correspondent banks.

45.     CLS also replaced client information in certain MT 103 messages with phrases such as "one of our clients" and "our good customer" to prevent the disclosure of ordering parties and beneficiaries covered by Swiss bank secrecy laws.  This practice, however, prevented CL New York from determining whether any of the participants' involved in the transactions violated U.S. sanctions law.

46.     In 2003, CL's Head Office circulated a memo stating that the phrases described above, among others, should not be used anymore and would be added to the filter.  Despite this instruction, CLS continued to employ the practice of replacing client information with ambiguous phrases, such as, "one of our clients" and "our good customer."

47.     On several occasions throughout the relevant period, CL New York learned—despite CLS's efforts—that a transaction involved a sanctioned entity and either blocked or rejected such a payment.  CLS did not question CL New York about the applicability of U.S. sanctions laws to the transactions they sent through the United States.  Moreover, CL New York explicitly reminded CLS compliance personnel that transactions that transit through the United States were subject to U.S. sanctions laws after some of these payments were rejected or blocked.  By way of example, on or about August 28, 2003, a CL New York compliance officer sent an approximately two-page email to two CLS compliance personnel providing "a summary of the OFAC oversight

regulations requirements that affect both CLA [Crédit Lyonnais Americas] and CL entities that transact business through the United States."

48.     Despite rejected payments and clear admonitions from CL New York, CLS persisted in sending non-transparent messages that violated U.S. sanctions laws through the United States.  Indeed, for three transactions totaling approximately $50,000, CLS went so far as to resubmit rejected payments, removing the information that caused the initial payment to be rejected with the intent of completing the illegal transactions.

*CAIS/CAS*

49.     In 2003, CAIS's Compliance department was divided into two groups: (1) Legal and Compliance, and (2) the Monitoring and Investigations unit ("MOIN"). Both were under the supervision of the Office of the General Secretary.  Prior to 2004, Legal and Compliance had responsibility for U.S. sanctions compliance, meaning the business lines and operational units turned to, and relied upon, Legal and Compliance for guidance.  In 2004, this responsibility was shifted from Legal and Compliance to MOIN.

50.     Throughout the relevant period, certain CAIS and CAS personnel, including personnel within Legal and Compliance and MOIN, knew that U.S. sanctions laws applied to transactions that CAIS and CAS sent through the United States.

51.     CAS developed policies and procedures to use cover payments (*i.e.*, MT 202 messages) which did not reference *any* sanctioned entity's involvement in transactions, fully recognizing that this payment method would conceal from CACIB NY and other U.S. financial institutions the fact that these transactions concerned sanctioned parties.  CAS did not share its policies and procedures for processing international

payments with CACIB NY, and CACIB NY lacked access to CAS's systems that contained these policies and procedures.

52.     As early as 2001, an attorney who was part of CAIS's  management team sent an email to a CACIB employee based in Paris, which stated that "to the extent the process used by our establishment via our U.S. correspondent bank ([U.S. Bank 1]), and whereby our establishment erroneously misleads the latter as to the real beneficiary for the transfers…and by the designation of an institutional beneficiary instead and in place of the actual one…whose identity [the U.S. correspondent] is unaware, we could expose ourselves to various sanctions in the USA.  To our knowledge, the majority of the Group entities operate in the same manner."

53.     This knowledge was not limited at CAIS to the Legal and Compliance team.  On February 2, 2004, a back office analyst made an internal note in the CAIS message system regarding omitting information in payment messages. She wrote, "[v]arious payments of ours were stopped by the U.S. banks, because within the text body of our instructions (MT 103 or 202), certain words such as Iraq, Iran, etc. were used, words which appear on the U.S. Banks automatic block list.  Consequently, be vigilant and do not put too much detailed information in your payments, thus avoiding costly back values."

54.     In 2004, when responsibilities for U.S. sanctions compliance were shifted to MOIN, the group required all transactions concerning countries subject to U.S. sanctions, and sanctions imposed by other jurisdictions, to be forwarded to MOIN for review and authorization.

55.     As early as June 10, 2004—shortly after this shift—a senior manager within MOIN, after noting in an email that "the reach of the American sanctions is . . . limited" and only applied to the "American territory," acknowledged that a payment involving a sanctioned entity that transited through the United States could potentially be blocked if the U.S. clearer learned of the existence of the sanctioned entity.

56.     Beginning in April 2005, a senior manager within MOIN commonly acknowledged in emails that U.S. sanctions applied to transactions that were sent through the United States: "OFAC (United States) has taken economic sanctions against Sudan and Iran for transactions which occur on U.S. territory and/or which are made out in Dollars and/or for which U.S. companies and individuals appear . . . and for which individual approval must be obtained from the U.S. authorities." This language demonstrates that certain CAS employees knew that U.S. sanctions applied to transactions that transited through the United States.

57.     In and around 2006, MOIN's own compliance materials acknowledged the "extra-territorial reach" of U.S. sanctions laws and that these laws cover "all investments and transactions in the United States or that involve a U.S. person anywhere in the world."

58.     On or about February 2, 2006, the Office of the General Secretary drafted a memorandum that stated "the simple fact of using a clearing bank in the United States requires complying with [anti-money laundering and OFAC] rules."

59.     Despite this knowledge, MOIN authorized many of the USD transactions forwarded to them, even though they violated U.S. sanctions, often precisely because the payment messages that were going to be sent to the United States would not reference a

sanctioned entity's involvement in a transaction.   The clear intent of ensuring that payment messages sent to the United States did not reflect information about sanctioned entities is reflected in a series of communications regarding two transactions that were rejected on or about March 29, 2006.  After CACIB NY notified a senior manager within the Office of the General Secretary of the rejected payments, the senior manager raised these rejected payments with a senior manager within MOIN and another member of MOIN.  Rather than asking how payments that violated Sudanese sanctions were sent to the United States, the senior manager within the Office of the General Secretary questioned why MT 103s were sent in connection with the payments and why CAS's systems that were processing payments involving Sudan used this message type (a message type that would clearly reveal the involvement of Sudanese entities).  When the senior manager within MOIN reported that the back office sent MT 202 messages to CACIB NY containing the ordering party's name and that CACIB NY learned of the Sudanese connection to the transactions through its own due diligence, CAS personnel complained about the heightened due diligence from their U.S. counterparts.  No one within CAS took any steps, at that time, to stop all USD MT 202 payments involving Sudan that cleared through the United States.

60.     Instead, MOIN authorized a number of other transactions involving Sudan to transit through the United States while emphasizing payment messages that would be sent through the United States did not reference Sudan.  For example, in March 2006, in an email copying a senior manager within the Office of the General Secretary, MOIN authorized a letter of credit for a Sudanese SDN bank, one of which was not on the SDN List, but was considered an SDN by operation of law.  Specifically, the email stated that

"at no moment shall information related to the transactions as such (End Beneficiary/Counterparty/End Bank) be transmitted/indicated within the aforementioned messages in accordance with what is acceptable under U.S. regulations."   MOIN authorized the transaction despite the fact that less than a year earlier CACIB NY rejected a nearly half-million dollar payment involving this Sudanese bank.

61.   Similarly, on October 10, 2006, in discussing a payment where the beneficiary was a Sudanese bank, a senior manager within MOIN approved the transaction, but instructed a senior back office employee that, "given the nature of both of these counterparties (Sudan) and the currency used (USD), I am reiterating the conditions established for the implementation of this transaction, to note: … At no moment shall information related to the transactions as such (End Beneficiary/Counterparty/End Bank) be transmitted/indicated within the aforementioned messages. . . ."

62.   In addition, certain CAS employees outside of MOIN directed sanctioned Sudanese banks to omit any reference to Sudan in MT 202 cover payment messages sent to U.S. correspondent banks.  For example, on July 26, 2005, a senior back office manager sent a SWIFT message to a Sudanese bank designated by OFAC as an SDN, stating, "We understand from drawer that you are ready to effect the relative payment. We therefore ask you to instruct your correspondent to cover our USD account held with [CACIB], New York,…(without any reference to Sudan in their cover through U.S. correspondent."  Similarly on November 21, 2005, another CAS back office employee gave the same instruction to a Sudanese SDN bank to omit any reference to Sudan in the cover payment sent through the U.S. correspondent bank.

63.    CAS also employed the practice of replacing client information on payment messages with ambiguous phrases such as, "one of our clients" and "our good customer." The practice continued despite the fact that CACIB NY had entered into a Commitment Letter in September 2005 with the Federal Reserve Bank of New York and the New York State Department of Financial Services (then the New York State Banking Department) in which it committed to enhance its Anti-Money Laundering and Bank Secrecy Act functions.  After a February 2006 meeting, CAS and CACIB NY developed a Modus Operandi whereby CAS agreed to screen all outgoing transactions against the SDN List to ensure CACIB NY that CAS was not originating payments on behalf of sanctioned entities, and CACIB NY agreed to submit informational requests to CAS for processing in an agreed upon manner.

64.    In December 2006, the Head Office decided to diversify USD clearing banks and CAS started using a non-affiliated bank based in the United States as its exclusive clearer. After establishing a relationship with a new clearing bank, MOIN persisted in approving transactions involving Sudanese entities, so long as messages that were sent to the United States did not reveal the involvement of the Sudanese entity:

a.   On or about July 20, 2007, a senior manager within MOIN, in an email to several bank employees, directed that (i) any reference to Sudan in a new letter of credit ("L/C") should be deleted since USD was the currency that would be used and/or (ii) the L/C should be modified so as to settle the transaction in another currency.

b.  On or about July 31, 2007, a member of MOIN noted when approving a proposed resale of Sudanese goods that the "SWIFT will not contain any reference to Sudan."

c.  On or about August 24, 2007, a MOIN employee again approved a transaction in favor of a CAS client involving the purchase of $187,433 of Sudanese goods in which the port of loading was located in Sudan.  The MOIN employee noted that this transaction was acceptable since the L/C associated with this transaction did not reference Sudan.  Indeed, the L/C simply stated that the port of loading for the goods purchased in this transaction was "African Ports."

d.  On September 5, 2007, the same MOIN employee acknowledged that for a transaction involving a different CAS client, a reference to Sudan could cause a "blocking or rejection of such a transaction" and directed that "**no reference is made to SUDAN and/or KHARTOUM."** [emphasis in original].

e.  On or about January 17, 2008, MOIN authorized a USD transaction involving Sudan, noting the payment messages, which were going to be generated in England would contain "no mention of Sudan, the BL's [bills of lading] indicating Port Sudan as the loading harbor."

65.     As late as February 4, 2008, a senior manager within MOIN stated that it would be prudent to avoid any mention of Sudan in letters of credit concerning goods of Sudanese origin or goods loaded in a port located in Sudan because "indeed, there is a risk that the operation may be blocked, if one of the correspondents knew the information

contained in the LC.  It is a low risk, but we still have to be careful about it with taking

right measures (other currency, deletion of the word "Sudan" in the LC, etc…)."

66.    In sum, CLS and CAIS, and later CAS, employed deceptive practices that

concealed the involvement of sanctioned entities and thereby deprived CL NY, CACIB

NY, and other U.S. financial institutions of the ability to filter for, and consequently

block and/or reject, sanctioned payments.  In total, from approximately August 2003

through approximately September 2008, CLS and CAIS, and later CAS, processed at

least $312 million in payments in violation of U.S. sanctions laws.  The overwhelming

majority of these violations involved Sudanese entities.  Additionally, other violations

implicated Cuban, Burmese, and Iranian entities.

## CACIB's Internal Investigation

67.    Throughout the course of this investigation, CACIB has cooperated with

U.S. authorities.  CACIB undertook a voluntary and comprehensive internal review of its

historical payment processing and sanctions compliance practices, which has included the

following:

a.  Committing substantial resources to conducting an extensive review of

records, including hard copy and electronic documents;

b.  Numerous interviews of current and former employees;

c.  A transaction review conducted by outside counsel and an outside consultant,

which included, but was not limited to, reviewing millions of payment

messages and trade transactions across various accounts related to sanctioned

countries, including an analysis of underlying SWIFT transmission data

associated with USD activity for accounts of banks in sanctioned countries;

d.  Regular and detailed updates to DANY and USAO-DC on the results of its
investigation and forensic SWIFT data analyses, and responding to additional
specific requests of DANY and USAO-DC;

e.  Multiple agreements to toll any applicable statutes of limitation; and

f.  Making numerous current and former CACIB employees available for
interviews by U.S. authorities.

## CACIB's Remediation

68.     CACIB has also taken voluntary steps to enhance and optimize its
sanctions compliance programs, including by:

a.  Installing more sophisticated filtering software;

b.  Creating additional compliance-focused groups to address sanctions
compliance and correspondent bank due diligence;

c.  Hiring numerous additional compliance employees;

d.  Adopting written compliance policies that address U.S. sanctions against Iran,
Burma, Sudan, and Cuba;

e.  Requiring the use and filtering of the MT 202COV on the earliest date on
which the new payment messages could be used;

f.  Adopting the Wolfsberg Principles for transparency in payment messages;

g.  Enhancing its trade finance due diligence protocols;

h.  Implementing extensive compliance training; and

i.  Retaining outside counsel to help the Bank assess and further improve
existing compliance programs and strategies.

69.     CACIB has also agreed, as part of its cooperation with DANY and USAO-

DC, to undertake the further work necessary to further enhance and optimize its sanctions compliance programs.  CACIB has also agreed to cooperate in DANY and USAO-DC's ongoing investigations into these banking practices.  Furthermore, CACIB has agreed to continue to comply with the Wolfsberg Anti-Money Laundering Principles of Correspondent Banking.